**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CARMEN HODGE,

              Plaintiff,

-vs-                                   Case No. 3:14-cv-102-J-34JRK

FEDERAL EXPRESS CORPORATION,

              Defendant.

_____/

# O R D E R

**THIS CAUSE** is before the Court on Defendant's Amended Motion for Summary Judgment and Incorporated Statement of Undisputed Material Facts (Doc. No. 23; Motion) filed on December 17, 2014.  In this action, Plaintiff Carmen Hodge (Hodge) alleges that Defendant Federal Express Corporation (FedEx) violated Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq., and the Florida Civil Rights Act (FCRA), Fla. Stat. § 760.01 et seq., by discriminating against her on the basis of race (Count One) and gender (Count Two), as well as retaliating against her for engaging in protected conduct (Count Three).  See generally Amended Complaint (Doc. No. 2; Complaint).  With respect to her discrimination claims, Hodge complains that FedEx failed to allow her to participate in certain training classes and experiences.  In support of her retaliation claims, Hodge asserts that after she complained of discrimination FedEx retaliated by suspending her and revoking her medical certification.  Hodge seeks all available damages for each of these claims.

In the Motion, FedEx requests that the Court enter summary judgment in FedEx's favor pursuant to Rule 56, Federal Rules of Civil Procedure (Rule(s)).  See Motion at 1.

Hodge filed a response in opposition to the Motion on January 20, 2015.  See Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgement [sic] (Doc. No. 29; Response).  With the Court's permission, see Order (Doc. No. 34), FedEx filed Defendant's Reply in Support of its Amended Motion for Summary Judgment (Doc. No. 36; Reply) on February 13, 2015.  Accordingly, this matter is ripe for review.

## I.    Background[1]

Hodge, an African American female who, as of the filing of this action was still employed by FedEx, began working for FedEx while attending the University of Florida in Gainesville, Florida in May of 2004.  See Videotaped Deposition of Carmen Hodge, Exhibit A to Motion (Doc. No. 25-1; Hodge Dep.) at 12-13, 15.  Hodge started as a handler and transitioned to a part-time courier at the Jacksonville FedEx office (commonly referred to as the NRBA station) in August or September of 2006.  See id. at 15-18.  As a courier, Hodge picks up packages for next-day delivery from customers and drop boxes.  See id. at 26-27. Upon arriving at the NRBA station, Hodge worked the "p.m. shift."  See id. at 19; see also Deposition of Gwen Pellegrino (Doc. No. 23-4; Pellegrino Dep.) at 7.  On that shift, Jennifer Hill was primarily Hodge's supervisor, although Hodge also worked under the supervision of Gwen Pellegrino at times.  See Hodge Dep. at 18-20, 32; Deposition of Jennifer Hill (Doc. No. 23-11; Hill Dep.) at 5-6, 8; Pellegrino Dep. at 6-7.

---

[1]    As discussed infra, for the purposes of resolving FedEx's Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to Hodge.  The Court notes that these facts may differ from those ultimately proved at trial.  See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

### A.      The ASPIRE Program and Additional Training

In early 2010, Hodge began asking both Hill and Pellegrino to allow her to participate in FedEx's ASPIRE program (the ASPIRE Program), which provided FedEx employees with the opportunity to obtain training to pursue internal management positions. See Hodge Dep. at 31-32, 37-38; Hill Dep. at 7-8.  At the time, employees were eligible to participate in the ASPIRE Program if they had no active warning letters, 2.5 or greater on a current 4-point performance review or a 5.5 on a 7-point performance review, two years of college or equivalent work experience, and four years of full-time work experience.  See Hodge Dep. at 34.  Hodge already had two years of college credit before she started working at FedEx, and she reached the requisite four years of experience in August of 2010. See id. at 40-41.

To begin the ASPIRE Program, all employees first had to take the ASPIRE to Management class.  Id. at 33; Pellegrino Dep. at 16-17.  Although Hodge took the class on March 13, 2010, five months earlier than she was eligible to do so, see Hodge Dep. at 35-36; 38-41, she explains that getting into the class was not without difficulty:

> Well, when I initially asked to be in ASPIRE, I was told, yes, we'll put you in ASPIRE.   And I knew the first thing you had to do was go to Saturday school for ASPIRE.   I said, I want to be in that Saturday class whenever it comes around.   Okay.
> Well, they ended up having the Saturday class.  I found out, like, on a Monday, a few of my friend[s] were in the Saturday class.  And I went to the -- I went to Gwen, I said, Hey, there was a Saturday class.  I wasn't in it, and I didn't know about it.
> Oh, I didn't know you wanted to be in it.   But this is me asking repeatedly to both managers that I wanted to be in that class.  And she said that she didn't know I wanted to be in the class.
> So I was like -- I was like, Okay.  I eventually did get it, but it was - - it was without me saying it like, you know, ten other times, like that I wanted to attend the Saturday class.   I knew how important it was to get the first Saturday classes in for the program.

Hodge Dep. at 36-37.  Hodge further testified that other employees who asked to be in the ASPIRE Program were able to do so right away, such as Tony Dukes, Adam McCann, and Shawn Simmons.  See id. at 42, 44-45; see also Pellegrino Dep. at 19 (acknowledging that Simmons was in the class that Hodge wanted to take but was too late to enroll).  Yet Jennifer Hill told Hodge to "take it slow," and ignored her request for months.  Hodge Dep. at 43, 47-48.

Other than completing the ASPIRE to Management class, employees could work through the ASPIRE Program in any order at their own pace.  See id. at 51-52.  However, when Hodge asked to make a workgroup presentation to complete one of the ASPIRE Program requirements, Hill told her over multiple conversations that Hodge had to complete everything else on the checklist first.  Id. at 50-52.  Hodge complains that two weeks later, she overheard Hill tell fellow employee Adam McCann, a white male, that he could make a workgroup presentation on Monday despite the fact that Hodge observed McCann completing his first Saturday class that day, which gave her the impression that McCann had not completed his checklist and was brand new to the ASPIRE Program.[2]  See id. at 53-56.

In February of 2011, Hodge met with John Briscoe, her senior manager, and Jennifer Hill, to discuss an internal EEOC complaint she had submitted.  See Hodge Dep. at 75-76.  At this meeting, Hodge asked about making her workgroup presentation, complaining that she did not want to take things slow and that Hill was intimidating her by being aggressive, yelling, pointing her finger in Hodge's face, and discriminating against her "as a black

---

[2]     While Hodge did not know the exact number of steps McCann completed, she knew she had completed more than he had because she was almost done and he had just started the first class Saturday, as of some time in February 2011.  See Hodge Dep. at 60-61.

person." See id. at 77-79.  Although Hill denies any such behavior, the Court accepts Hodge's testimony as to the intimidating conduct for the purposes of summary judgment.[3] The end result of this meeting was that Briscoe promised to help Hodge get as much of the ASPIRE Program done as he could.  Id. at 81.  Hodge ultimately gave her workgroup presentation in March of 2011.  See id. at 64, 81.

Hodge also testified that Shawn Simmons, a white employee, was able to get any training he was interested in, such as dangerous goods[4] or TORTES[5] training, but when Hodge or another black employee, "AJ," requested the same training, they were told to take it slow or that it was not in the budget.  See id. at 69-72.  Although Hodge's courier position does not require either dangerous goods or TORTES training, see Declaration of Jennifer L. Hill (Doc. No. 23-9; Hill Decl.) ¶¶6-7, Hodge testified that everyone in the ASPIRE Program wants to take dangerous goods training, see Hodge Dep. at 72.  Additionally, Hodge explained that before she became a sort lead, all the other sort leads had received dangerous goods training.  See id. at 73-74 ("Countless other people that were in ASPIRE was given the opportunity to get [dangerous goods] training.  But the sort leads in particular,

---

[3]     However, the Court does not consider Hodge's conclusory and/or speculative statement that it was because she was African American.  Rather, the Court will look to the evidence or lack of evidence as necessary below to determine whether Hill took any relevant employment action or made any decisions on the basis of race.

[4]     Dangerous goods training is necessary for positions that require inspecting dangerous goods and completing the relevant paperwork called dangerous good agent positions.  See Hill Dep. at 11, 17, 36. The content of the class involves training on the proper inspection of any dangerous goods to ensure that it is legal for those goods to travel within the FedEx system, the completion of the proper paperwork to document the location of the products on the truck, and downline stationary report notification.  See id. at 11.

[5]     TORTES (Truck Operations Reporting Tracking and Entry System), misspelled throughout several depositions as "torts," is a computerized system of compiling paperwork for truck routes.  See Hill Dep. at 29-30.  The name of the system changed to TRIPS in approximately 2012.  See id. at 31.

all of them had [dangerous goods] training, except for me."). Hodge testified that because she did not have dangerous goods training, she did not apply for various positions that she believed required such training. See id. at 83-84 ("I knew that without [dangerous goods] training I would automatically be exempt from half of the applications going out."). Although she knew that she could apply for those positions, Hodge believed that lacking such training would reflect poorly on her status as an applicant. See id. at 72.

In her Declaration, Hill explained that when Hodge requested dangerous goods training, "it was not feasible or operationally necessary." See Hill Decl. ¶7; see also Hill Dep. at 12-14. Dangerous goods training is a week-long training session which requires travel to the nearest FedEx location offering it, which would be Ft. Lauderdale, Florida for the NRBA station. Hill Decl. ¶7. The cost of such training includes travel, lodging, and meal expenses as well as wages for time spent in training and coverage for the employee's absence. See id.; Hill Dep. at 13. As such, to send someone to dangerous goods training, Hill was required to obtain a senior manager's approval, and she has done so at least twice during her time as a supervisor at the NRBA facility.[6] Hill Dep. at 13-15. In both such instances, Hill

---

[6]    Hodge testified that Steven Capehart had dangerous goods training. See Hodge Dep. at 73. Similarly, Hodge testified that Simmons got any training he requested, including dangerous goods training. See id. at 70, 74. In her affidavit, Hodge states that Jennifer Hill gave both men dangerous goods training in 2011. See Affidavit of Carmen Hodge in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 29-2; Hodge Aff.) ¶9. However, as to Capehart, FedEx submitted records showing that Capehart became a manager of a FedEx location in Chattanooga, TN beginning February 16, 2010, see Offer Letter (Doc. No. 25-10 at 92), and that prior to that he was a dangerous goods specialist from April of 2008 to September 2009, see Job-Related Knowledge Documentation Form (Doc. No. 25-10 at 49). While FedEx does not provide similar records for Simmons, it provides Hill's declaration in which she swears that dangerous goods training was operationally necessary for Simmons. Hill Decl. at ¶10. FedEx further cites Hodge's deposition testimony in which she was unable to explain what the circumstances were surrounding his request for training and how she was aware of it. See Motion at 18; Hodge Dep. at 70-71; 74-75. Because the Court views the evidence in the light most favorable to Hodge, to the extent supported by the record, and Hodge testified that she had conversations with Simmons and therefore had personal knowledge of his training history, the Court assumes that Simmons requested and received dangerous goods training during the relevant time frame.

authorized the employee to obtain the training after the employee applied and was selected for a dangerous agent position as the training was, at that point, necessary. Id. at 16-17; Hill Decl. ¶9. Hodge did not apply for a dangerous goods agent position.[7] Hill Decl. ¶9. Hodge's position as a courier did not require either dangerous goods or TORTES training. See id. ¶6. Nevertheless, Hodge ultimately received TORTES training after the system transitioned to TRIPS. See id.

As of June 1, 2012, FedEx replaced the ASPIRE Program with a new training program called AIM. See Hodge Dep. at 84-87; Hodge Aff. ¶5. However, employees who had completed the ASPIRE Program were given a two year grace period during which they could rely on their ASPIRE Program certification in applying for management positions. See id. Fortunately, Hodge completed the ASPIRE Program on May 30, 2012, and as such, she had the benefit of the ASPIRE Program certification until May 31, 2014, when the grace period expired. See id. at 82-86. Nevertheless, Hodge did not apply for any management positions until March of 2014, when she applied for open positions in the Atlanta and Orlando offices. See id. at 83-84. It appears that her delay was at least partially attributable to her belief that she would not be successful without dangerous goods training. See id. at 84. Although it is undisputed that Hodge completed the ASPIRE Program, Hodge summarizes her struggles with the program in her Affidavit:

> I was hampered and obstructed by members of Defendant Federal Express Corporation management team at the NRB (Salisbury Road) facility on account of my race, African American, and sex, female, such that members of the Federal Express NRB facility management took actions to delay my

---

[7]    Notably, the dangerous goods agent position would have been a demotion from Hodge's position as a courier. Hill Decl. ¶9.

> completion of the ASPIRE program.  Due to their actions I was unable to complete the program in a timely manner and was unable to use my completion of the program as a qualification to enhance my opportunities for promotion.

Affidavit of Carmen Hodge in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 29-2; Hodge Aff.) ¶4.  Hodge also states that at some unspecified time Senior Manager Chris Payne told her that completion of the ASPIRE Program would no longer help her with possible promotions and she would need to complete the AIM program.  See id. ¶6.  The grace period for relying on the ASPIRE Program certification has now ended and Hodge had not started the AIM program as of the date of her deposition last year, at which time she indicated that she was waiting until the resolution of this lawsuit to do so.  See Hodge Dep. at 87-88.

### B.    Sort Lead

Pellegrino explained the role of a sort lead as follows:

> A sort lead is someone - - it's basically a title.  It's not an actual position.  It's someone who expresses an interest in additional responsibilities and shows the willingness to take on additional responsibilities to ensure the operation goes smoothly.
> . . .
> Well, we actually have multiple sort leads like I said.[8]  We'll have someone who is a lead for dangerous goods; we'll have someone who is a lead for the document sort; we'll have someone who is a lead on the box side.  And those individuals, since the manager can't be at all places at all times, will watch their individual areas and help to make sure that everyone is doing what they need to do.  And, if they see a problem, get the manager's attention and make sure that it gets resolved.

---

[8]    The record is unclear as to whether there was more than one sort lead, with Hodge testifying that there was only one, at most two, Hodge Dep. at 68, and Pellegrino testifying there were multiple sort leads, Pellegrino Dep. at 9-10.  This discrepancy is not material.

Pellegrino Dep. at 9-10.  Notably, Hodge acknowledges that sort lead is an informal title that comes with no pay raise or additional benefits.  <u>See</u> Hodge Dep. at 66; Pellegrino Dep. at 10, 20 ("Sort lead is just anyone who is helping on the sort.").

Nevertheless, Hodge appears to believe or contend that serving as a sort lead was necessary in order for her to complete the ASPIRE Program and would help her obtain a promotion.  <u>See</u> Hodge Dep. at 48, 153; Hodge Aff. ¶8 ("The sort lead position is and was widely considered a higher position than courier/driver within the Federal Express NRB facility.  Being in the position was widely considered to enhance promotional opportunities."). However, FedEx submits an ASPIRE checklist that does not include serving as a sort lead as an ASPIRE Program requirement, <u>see</u> New Steps Checklist for AGFS and U.S. Operations Employees (Doc. No. 25-3 at 85), and Hodge does not dispute that she successfully completed the ASPIRE Program without having served as a sort lead.[9] Additionally, Pellegrino testified that there is no documentation in an employee's personnel file that they worked as a sort lead, and explained that, as far as obtaining a promotion to a management position,

> All it would do is allow someone to be able to speak that, you know, on - - if, during an operations, they had helped the manager, you know, ensure that the operations go down.  It just is more of something that could help them

---

[9]     Despite acknowledging the informality of the sort lead role, Hodge submits the Affidavit of Anthony Jones in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 29-1; Jones Aff.)—who may or may not be the same person Hodge refers to as Adrian Jones—in which he states that sort lead "was a job position within Federal Express Corporation at that time which was considered to be a promotion, or higher position, within Federal Express than being a driver."  Jones Aff. ¶3.  To the extent that Jones asserts that the sort lead was "considered" a promotion, the record does not support this conclusory statement and it does not contradict Hodge's own testimony that the position came with no increase in pay or benefits.  Moreover, "statements of personal opinions, general beliefs and feelings, by their very nature, do not raise disputes of fact."  <u>Green v. Miami-Dade Cnty.</u>, Case No. 02-22996, 2003 WL 22331877, at *6 (S.D. Fla. Sept. 9, 2003).

> understand how an [sic] operations work when they go to the interview process to allow them to speak more aptly to what a manager does.
>
> . . .
>
> . . . I've never, you know, been a senior manager, so I'm not sure if that would be something that would count towards anything.  But, again, it would allow them to speak more clearly at how the operation works.
>
> . . .
>
> . . . I know many people who are sort leads and have acted as sort leads that would not still be able to, you know, make any attempt at management.  I mean, we have handlers that, you know, have not finished college, that would never be able to - - you know, pursue management, but they can be a lead. It's just someone who says that they want to help.

Pellegrino Dep. at 11-12.  Construing the record in the light most favorable to Hodge for purposes of summary judgment, the Court considers the sort lead role as an informal position that provided some marginal benefit in applying for promotions but was not itself a specific training function or a promotion for a courier such as Hodge.

In her deposition, Hodge testified that Pellegrino told her and Adrian Jones that there would be an interview process for the position of sort lead, but a few days later Pellegrino and Hill placed Shawn Simmons in that position without an interview.  Hodge Dep. at 65-66; 162-63; Pellegrino Dep. at 9.  Pellegrino testified that she placed Simmons, a white male, in the sort lead position because he had been displaced from his route and was going to be in the building until he could be placed on another route.  See Pellegrino Dep. at 21-22. Some time in 2013, Hill made Hodge the sort lead without going through an interview process or requiring an application.  See Hodge Dep. at 68-69.  She served as the sort lead for roughly a year until FedEx restructured her route to include a larger customer that required her to return to the NRBA station towards the end of her shift which meant she could not act as a sort lead.  See id. at 69; Hill Decl. ¶5; Hill Dep. at 21.

**C.     The Tree Branch Accident**

Pursuant to FedEx's policies,

> [t]he operator of revenue road licenced vehicle (i.e., Company owned, rented or leased) must report any incident of a vehicle coming in contact with an object, property or person to a member of their management or dispatch if management is not available. . . The driver is not to leave the scene of the accident without management approval.

8-90 Vehicle Accidents/Occurrences (Doc. No. 25-3 at 27-34; Accident Policy) at 3.  On May 14, 2010, David Leech sent out an inter-office memorandum addressing the reporting requirements to ensure that FedEx employees were "well informed of the Company's expectations."  See Inter-Office Memorandum RE: Vehicle Accidents/License Requirements (Doc. No. 25-3 at 47-53; Accident Memorandum) at 1.  In the Accident Memorandum, Leech reiterated:

> Whenever your vehicle comes in contact with any object, person or thing, regardless of whether there is any resulting damage to the Company vehicle you are operating, regardless of whether there is any damage to the object, person, or thing your vehicle came into contact with, regardless of whether the person you came in contact with says they are injured or not or plan to file a claim against FedEx Express or not, regardless of whether the owner of the object or thing you struck states that there is any damage to the object or thing or plans to file a claim against FedEx Express, you are required to report that incident to a member of management immediately and before operating the vehicle for Company business.  You are also required to obtain permission from management before you leave the scene of the accident/occurrence. Failure to report an accident/occurrence as outlined above will result in severe disciplinary actions, up to and including the termination of your employment, including on a first occurrence.

Id. at 2 (emphasis omitted).  He also listed five different scenarios as examples of when to notify management of an accident or occurrence, the second of which describes operating a Company vehicle when it comes in contact with a mailbox, tree limb, or other object at a customer location, and explains that an employee in that situation is required to immediately

report the incident to management.  <u>See</u> <u>id.</u> at 3 ("You should NOT operate your vehicle until you have contacted a member of management to advise them of the situation and obtain permission to leave the scene of the accident/occurrence.").  Hodge received both the Accident Policy and the Accident Memorandum and was aware of FedEx's policy prior to November of 2011.  <u>See</u> Hodge Dep. at 24-26.

On November 11, 2011, Hodge was driving a FedEx truck on Kings Road and turning onto Hood Road when a tree limb fell from a tree and struck her car on the right side mirror. <u>See</u> <u>id.</u> at 88-90.  As Hodge was driving on a two-lane road, she slowed down to make sure everything was okay but had no room to pull off to the side of the road at that location. <u>See</u> <u>id.</u> at 90-92.  Instead, she reported the accident to Pellegrino about thirty minutes later after she had returned to the station.  <u>See</u> <u>id.</u> at 98-99; <u>see also</u> Pellegrino Dep. at 22.[10] Pellegrino testified that, under FedEx policies, employees are expected to pull over as soon as they can and report any incident.  <u>See</u> Pellegrino Dep. at 23, 25-26.  When Hodge approached Pellegrino that night, Pellegrino was under the mistaken impression that Hodge had reported the accident to dispatch before leaving the scene.  <u>See id.</u> at 30-31.  Together, Pellegrino and Hodge inspected the damage to the vehicle, which was minor, finished the sort operations for the night, and recorded Hodge's written statement.  <u>Id.</u> at 27.  Hill, who was on vacation at the time, also assumed that Hodge had contacted on-duty management on the day of the accident before leaving the location.  Hill Decl. ¶24.  The following week, on Hodge's next work day, Pellegrino went with Hodge to the scene of the accident, where

---

[10]     Hodge did not have a cell phone at the time of the accident, but she did have a PowerPad, through which she could have contacted someone in dispatch to reach management.  <u>See</u> Hodge Dep. at 115-16; Pellegrino Dep. at 23-24, 27.

Hodge pointed out the approximate location of the falling tree branch as they drove by it. See Hodge Dep. at 100-01; Pellegrino Dep. at 27-29.  Because Pellegrino did not take any photos,[11] Hodge took it upon herself to take some and send them to the safety coordinator for Florida.  See Hodge Dep. at 101-04.[12]

After a vehicle accident, a manager and a senior manager, in this case John Briscoe, review the Accident Policy and determine the appropriate discipline.  See Pellegrino Dep. at 31-32.  Initially, Hill determined that Hodge could have avoided the accident "because Ms. Hodge struck a stationary object and did not adjust her speed to avoid potential hazards on a road she had previously traveled."  Hill Decl. ¶25.  Based on this finding, Hill issued Hodge a counseling statement, which was not a disciplinary action.  Id.  Hodge appealed this determination through several different avenues unsuccessfully.  See Hodge Dep. at 104, 106-11. Through the course of the appeal process, Hill learned that Hodge "failed to obtain permission from management to leave the scene of the accident on November 11, 2011." Hill  Decl.  ¶26.    Accordingly,  after  conferring  with  Briscoe,  and  at  the  direction  of

---

[11]     Pursuant  to  FedEx  Safety  Manual  Section  4-8,  Accident/Occurrence  Investigation  and Preventability Determination (Doc. No. 25-3 at 35-47; Accident Investigation Policy),

> When arriving at the scene, the manager will (when pertinent):
> (1) Check on the condition of your driver and others involved.
> (2) Secure our vehicle and its contents.
> (3) Photograph the scene.
> (4) Gather information for your report.
> (5) Sketch the scene.
> (6) Secure witness statements.

Id. at 108.

[12]     Pellegrino stated that, while she brought her camera on the post-accident check ride, Hodge was unable to identify the location of the accident and that is why she did not take any pictures.  See Pellegrino Dep. at 29-30.  However, Hodge disputes this testimony, stating that she was able to identify the location. See Hodge Dep. at 101-02.

management, Hill issued Hodge a warning letter dated December 8, 2011, and suspended her for five days.  See Hodge Dep. at 111-12; Hill Decl. ¶¶27-28; Hill Dep. at 44-46; Inter-Office Memorandum RE: Warning Letter/Disciplinary Suspension/05-3-S5-Prev Veh Acc/Occ, Exhibit 8 to Hill Decl. (Doc. No. 23-10 at 17-18; Warning Letter).  Hodge believes that she got the Warning Letter a month after the accident because she "pushed it," meaning because she had appealed the issuance of the counseling statement.  See id. at 112-13.

Hodge does not dispute that she did not report the accident at the scene, but testified that FedEx did not follow its own policies as far as investigating the accident and taking pictures, which she believes rendered the entire process suspect.  See id. at 113-15; 119-20.  Although the Accident Policy states that a warning letter and a one-week unpaid suspension is the minimum discipline that will result from failure to report an accident or occurrence, see Accident Policy at 6, Hodge explains that she felt she was being treated unfairly:

> It is - - it is - - given that it was an act of God that y'all would write down in your policy, given that a tree limb - - a tree limb fell on my truck, and that - - that is the one thing that you have in your policy that is removed as an accident or occurrence, I figured - - and with - - without y'all doing any kind of investigation at all, I thought that was extremely unfair.  I cannot prevent a tree from falling from - - a limb from falling from a tree on my truck.  But besides that, I'm a safe driver and I acted accordingly.  So for - - for this, I think it's unfair, since it's in your policy that an act of God cannot - - that you shouldn't be disciplined for that.

Id. at 117-18.  Hodge's suspension affected her ability to be considered for promotions for one year.  See Hodge Aff. ¶7.[13]

_____

[13]    In its Reply, FedEx cites its Acceptable Conduct policy which states that a warning letter will not prohibit job change applications.  See Reply at 3 (citing Supplemental Declaration of CoAnn Sims Ressler (Doc. No. 36-1; Supplemental Ressler Decl.) ¶3).  Specifically, the Acceptable Conduct policy states:

Warning Letters serve as a notification of behavioral deficiency, and are active in PRISM for
                                                                              (continued...)

### D.    Sleep Apnea

As a courier, the Department of Transportation (DOT) requires Hodge to get an annual physical to maintain her certification.  See Hodge Dep. at 129-30, 133.  In late 2011, Hill directed Hodge to obtain a physical with a FedEx company-approved Medical Review Officer (MRO).  See Hill Decl. ¶¶17-18; Hill Dep. at 38-39.  Hodge selected a Carepoint facility where MRO Dr. Denise Agatep, examined Hodge, and due to her weight, high blood pressure, and the circumference of her neck, diagnosed Hodge with sleep apnea.  See id. at 134-35; see also Hill Dep. at 38-39; Hill Decl. ¶18.  Nevertheless, Dr. Agatep gave Hodge a conditional clearance for three months in order to allow her to obtain a sleep study.  See Hodge Dep. at 135-36; Hill Decl. ¶18; Medical Examination Report dated December 16, 2011, Exhibit I to Motion (Doc. No. 23-13; December 16th Medical Report).  Although Hodge previously had done a sleep study in 2008 and attempted to provide it to Dr. Agatep, Dr. Agatep did not accept it.  Hodge Dep. at 136-39.  At the conclusion of the three month period, without the appropriate certification, the MRO processed Hodge as failing her physical on March 6, 2012.  Hill Decl. ¶19, Exhibit 5 to Hill Decl. (Doc. No. 23-10 at 13); Hill Dep. at 39-40; Hodge Dep. at 139-40.  Consequently, Hodge could not drive her carrier route as of March 6, 2012, and had to take leave without pay for failing to meet DOT standards.

---

[13](...continued)
12 months from the date a Warning Letter is issued but will not prohibit JCA/JCATS submissions. However, an active, job related Warning Letter may affect the selection decision for a period of 12 months. The hiring manager, with Human Resources consultation, should determine if the conduct noted in the active Warning Letter is related to the posted position.

2-5 Acceptable Conduct Policy, Exhibit A to Supplemental Ressler Decl. (Doc. No. 36-1 at 3-15), at 6. Thus, construing the evidence in the light most favorable to Hodge, a Warning Letter such as the one she received could have affected her chances of receiving a promotion if she had applied for one.

See Hodge Dep. at 137-40; Hill Decl. ¶20.  On March 13, 2012, Hodge went back to her own doctor who prepared a letter stating that she did not have sleep apnea and Hodge gave a copy to John Briscoe.  See Hodge Dep. at 141. While FedEx processed this new information, at Hodge's request, Briscoe found her a position in the warehouse that would not require driving.  See Hill Dep. at 40; Hodge Dep. at 141-42.  Ultimately, Dr. Agatep cleared Hodge to return to work, she obtained her DOT certification, and she returned to her prior position on March 16, 2012.  See Hodge Dep. at 144-47; Medical Examination Report dated March 6, 2012 (Doc. No. 25-3 at 96); Exhibit 7 to Hill Decl., Clearance Letter (Doc. No. 23-10 at 16); Hill Decl. ¶¶21-22.

Hodge testified that she believes the delay in her DOT certification was discriminatory and/or retaliatory and explained:

> Well, one, my - - they were going strictly off of my - - off of my size.  They went and looked at me as a big girl, and just said, no, you have it.  We're just going to take you off your route, which caused me to lose money right around Christmastime.  So, yeah.
>     Also that it - - the fact that this happened to me without having sleep apnea and Ron Revis has sleep apnea and never was taken off of his route when I was talking to him, I feel like that is - - that's kind of discriminatory, that you allow this older man to run his route with sleep apnea.  I don't have it, and you force me to get off the road.  I felt that was discriminatory, especially based on everything that was happening up - - up until this point.
>      . . .
> . . . [H]e [said that he] had the test, he did have sleep apnea, but that he did not want to lose money, so he was going to work regardless.  And he said that he showed up to work, and he's going to work.

Hodge Dep. at 149-50.  Nevertheless, Hodge acknowledged that she did not know the circumstances surrounding Revis's certification nor did she have any evidence that Hill was involved in the decision to deny or grant her own DOT certification.  See id. at 150.  In her Declaration, Hill states that Revis obtained the necessary clearance from his physician within

the three month period he, like Hodge, was given, and therefore, did not have to be taken off his courier route.  Hill Decl. ¶23.

### E.    EEOC Charge

On October 15, 2012, Hodge filed a Charge of Discrimination with the Florida Commission on Human Relations (FCHR) and the Equal Employment Opportunity Commission (EEOC).[14]  See Charge of Discrimination, Exhibit A to Complaint (Doc. No. 2 at 8-10; EEOC Charge).  In the EEOC Charge, Hodge alleged that Hill and Pellegrino told her to take the ASPIRE Program slowly since she began asking about it in 2010, that she was prevented from doing a presentation for the ASPIRE Program when other white, male employees were permitted to do so, and another white male was selected to be the sort lead. EEOC Charge at 1.  Hodge further alleged that, when she complained about this ongoing discrimination in February of 2011, FedEx retaliated against her by suspending her for five days and claiming that she had sleep apnea when she did not.  See id.  The EEOC determined that it could not conclude that FedEx violated the relevant statutes and issued Hodge notice of her right to sue.  See Dismissal and Notice of Rights, Exhibit B to Complaint (Doc. No. 2 at 10).  Hodge then filed the instant action.

## II.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to

---

[14]     In Hodge's Deposition, she suggests that she filed multiple EEOC charges, see Hodge Dep. at 29-30, 45 ("I sent multiple complaints in.  This is just one complaint. . . there's, like, way more complaints than just this one), but later clarifies that she also filed an internal EEOC complaint with FedEx.  See id. at 46-47. Further, Hodge only attaches one charge to her Complaint.

be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[15]   An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and

---

[15]       Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amendments.

The standard for granting summary judgment remains unchanged.  The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

"[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248.   In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.   Discussion

### A.   Timeliness

A prerequisite to bringing suit under Title VII is the timely filing of a charge of discrimination.  <u>Davis v. Polk Cnty. Sheriff's Office</u>, 170 F. App'x 598, 600 (11th Cir. 2005) (citing <u>Maynard v. Pneumatic Prods. Corp.</u>, 256 F.3d 1259, 1262 (11th Cir. 2001)).  In cases involving discrete discriminatory acts such as termination, failure to promote, denial of transfer, or refusal to hire, the discriminatory act occurs on the day that act happens. <u>Thomas v. Ala. Council of Human Relations, Inc.</u>, 248 F. Supp. 2d 1105, 1115 (M.D. Ala. 2003).  And, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113 (2002).  Under 42 U.S.C. § 2000e-5(e)(1), a claimant must file a charge of discrimination with the EEOC

> within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier.

42 U.S.C. § 2000e-5(e)(1).  Because Florida is a deferral state,[16] an employee must file a charge "within 300 days of the last discriminatory act." Davis, 170 F. App'x at 600.  As such, a Title VII claimant "can only file a charge that covers discrete acts that 'occurred' within the appropriate time period" - here, within 300 days of each alleged incident of discrimination.[17] Morgan, 536 U.S. at 114.   Additionally, under the FCRA, an employee may file an administrative complaint with the Florida Civil Rights Commission within 365 days of the alleged violation.  See Fla. Stat. § 760.11; see also Wolf v. MWH Constructors, Inc., 34 F. Supp. 3d 1213, 1222 (M.D. Fla. 2014).

FedEx argues that, because Hodge filed her EEOC Charge on October 15, 2012, and her claims do not constitute a continuing violation, any discrete discriminatory and/or retaliatory acts that occurred before December 20, 2011, for Title VII purposes, and October 16, 2011, for FCRA purposes, are time barred.  Motion at 9-10.  This would include Hodge's allegations that she was treated unfairly with respect to the ASPIRE Program. See id. at 10. In opposing summary judgment, Hodge did not address this issue. See generally Response. The limitations period for a claimant to file a charge of discrimination commences when the adverse employment decision is made and the employee is notified.  See Delaware State College v. Ricks, 449 U.S. 250, 259 (1980).  With respect to Hodge's claims that FedEx prevented her from entering the ASPIRE Program via completion of the ASPIRE to

---

[16]     A deferral state is one that "prohibit[s] the unlawful employment practice at issue and [has] established state or local authorities to grant or seek relief for such practice." See Davis, 170 F. App'x at 600 n.2 (quoting Maynard, 256 F.3d at 1262-63).

[17]     Nevertheless, "[t]he existence of past acts . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." Morgan, 536 U.S. at 113.  Additionally, the statute does not "bar an employee from using the prior acts as background evidence in support of a timely claim." Morgan, 536 U.S. at 113.

Management course, both the 300-day Title VII time limit and the 365-day FCRA time limit began when she alleges that Pellegrino and/or Hill refused to place her in the class. Although the exact date this occurred is unclear, it was some time prior to March of 2010, when Hodge completed the course. Similarly, with respect to her claim that she was not permitted to complete her workgroup presentation when other white male employees were, the time limits began in February of 2011, when Hodge requested to make her presentation, Hill refused, and she learned that a fellow employee was not only permitted but encouraged to make his presentation before her. Both of these instances of alleged discrimination occurred well before October 16, 2011, and therefore are outside the scope of the instant action.[18]

### B.    Race and Gender Discrimination[19]

Title VII provides "that it is unlawful for an employer 'to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" Holifield v. Reno, 115 F.3d 1555, 1561 (11th Cir. 1997) (quoting 42 U.S.C. §§ 2000e-2(a)(1)). A plaintiff may establish a Title VII discrimination claim through the introduction of direct or circumstantial

---

[18]    It appears that Hodge's Title VII retaliation claim based on her suspension would also be time barred as her Warning Letter was dated December 8, 2011 and the fact that Hodge appealed the Warning Letter did not toll the time for filing a charge. See Ricks, 449 U.S. at 261 ("[T]he pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the statue of limitations periods."). FedEx does not make such an argument, and regardless, Hodge's retaliation claim would be timely under the FCRA.

[19]    Hodge asserts parallel race and gender discrimination claims under Title VII and the FCRA. See generally Complaint. "Because the FCRA is modeled after Title VII, and claims brought under it are analyzed under the same framework, the state-law claims do not need separate discussion and their outcome is the same as the federal ones." See Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1271 (11th Cir. 2010) (internal citation omitted); Gray v. City of Jacksonville, Fla., 492 F. App'x 1, 3 (11th Cir. 2012).

evidence or statistical proof of discrimination.[20]  Lee v. U.S. Steel Corp., 450 F. App'x 834, 839 (11th Cir. 2012) (citing Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010)).  Where, as here, the plaintiff relies on circumstantial evidence of discrimination,[21] the Court applies the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Alvarez, 610 F.3d at 1264.  However, a plaintiff may also present "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  Edmond v. Univ. of Miami, 441 F. App'x 721, 723 (11th Cir. 2011) (citing Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)).

When relying on the McDonnell Douglas framework to support a claim of discrimination, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  A plaintiff establishes a prima facie case of discrimination under Title VII by showing: "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated [white and/or male] employees more favorably; and (4) she was qualified to do the job." McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008) (internal quotations omitted); see also Holifield, 115 F.3d

[20]     Title VII encompasses disparate treatment discrimination claims as well as disparate impact claims.  Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1312-13 (11th Cir. 1994).  Hodge has not alleged disparate impact discrimination, which involves facially neutral employment practices which have significant adverse effects on protected groups, the evidence of which usually focuses upon statistical disparities rather than specific incidents.  See Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807-08 (11th Cir. 2010). Here, Hodge's race discrimination claims are premised on disparate treatment; she contends that FedEx took a number of actions against her because of her race and gender.  See Reeves, 594 F.3d at 807.

[21]     Hodge does not argue that she has presented direct evidence of intentional discrimination.  A plaintiff may "present direct evidence of discriminatory intent in the form of actions or remarks of the employer reflecting a discriminatory attitude."  Hill v. Metro. Atlanta Rapid Transit Auth., 841 F.2d 1533, 1539 (11th Cir. 1988), amended on reh'g on different grounds, 848 F.2d 1522 (11th Cir. 1988).  "Direct evidence is that which shows an employer's discriminatory intent 'without any inference or presumption.'"  Hinson v. Clinch Cnty., Ga. Bd. of Educ., 231 F.3d 821, 827 (11th Cir. 2000)(citation omitted).  However, "only the most blatant remarks, whose intent could be nothing other than to discriminate" will constitute direct evidence of discrimination.  Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989).

-22-

at 1562.  "To make a comparison of the plaintiff's treatment to that of [employees outside plaintiff's protected class], the plaintiff must show that [she] and the employees are similarly situated in all relevant respects."  Holifield, 115 F.3d at 1562.  If a plaintiff cannot identify a similarly situated comparator who was treated more favorably than himself, "summary judgment is appropriate where no other evidence of discrimination is present."  Id.

Significantly, with respect to the second prong of the prima facie case, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action."  Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001).  Rather, the Eleventh Circuit instructs that "to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment."  Davis, 245 F.3d at 1239; see also Crawford v. Carroll, 529 F.3d 961, 974 n.14 (11th Cir. 2008) (noting that the broader standard applicable in retaliation claims has no application to substantive Title VII discrimination claims).  While a plaintiff is not required to prove "direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment."  Davis, 245 F.3d at 1239.  "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  Id.; see also Holland v. Gee, 677 F.3d 1047, 1057 (11th Cir. 2012); Miller-Goodwin v. City of Panama City Beach, Fla., 385 F. App'x 966, 970 (11th Cir. 2010).  "Otherwise . . . every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination

suit." <u>Doe v. DeKalb Cnty. Sch. Dist.</u>, 145 F.3d 1441, 1449 (11th Cir. 1998) (internal quotations omitted).

If the plaintiff presents a <u>prima facie</u> case, that evidence "creates a presumption that the employer unlawfully discriminated against the employee," and the burden of production shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254-56 (1981); <u>Alvarez</u>, 610 F.3d at 1264.  If the defendant meets this burden of production, the burden shifts back to the plaintiff to show that the stated reason is a mere pretext for unlawful discrimination and was not the "true reason for the employment decision." <u>Burdine</u>, 450 U.S. at 256; <u>Alvarez</u>, 610 F.3d at 1264; <u>Holifield</u>, 115 F.3d at 1565 ("[T]he plaintiff has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." (citing <u>McDonnell Douglas</u>, 411 U.S. at 804)).  A plaintiff may satisfy this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Burdine</u>, 450 U.S. at 256. "Despite these shifts in the burden of production, the ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against her." <u>Alvarez</u>, 610 F.3d at 1264.

### 1. Failure to Train

Even if Hodge's claims related to the delay in her participation in the ASPIRE Program and the difficulties she encountered in completing it were timely, FedEx argues that she fails to establish a <u>prima facie</u> case of discrimination because she did not suffer an adverse

employment action.  See Motion at 10-14.  Hodge's claims of discrimination are based on her allegation that FedEx did not allow her to complete the ASPIRE Program in a timely manner because of her race and gender.  In her Response, Hodge argues that FedEx obstructed her completion of the ASPIRE Program which "led to her missing out on promotional opportunities and Plaintiff must start anew in a new program called AIM." Response at 3.  However, Hodge does not point to any specific management position that she would have applied for had she completed the ASPIRE Program earlier, nor does she identify any other manner in which any delay in completing the ASPIRE Program seriously and materially affected the terms, conditions, or privileges of her employment.  See Davis, 245 F.3d at 1239.  While Hodge suggests that she was unable to make use of the ASPIRE Program because of the allegedly discriminatory delays and subsequent replacement of the ASPIRE Program with a new one, she ignores the fact that FedEx provided a two-year grace period from the end of the ASPIRE Program during which Hodge could have used her ASPIRE certification to apply for promotions without having to go through the AIM program. See Hodge Dep. at 86-87; see also Reply at 5-6.  Despite this opportunity, Hodge did not apply for any managerial positions for almost two years, until March of 2014.[22]  See Hodge Dep. at 83.  Moreover, whether Hodge would have completed the ASPIRE Program more quickly if she had not been delayed from taking the ASPIRE to Management class and in making her workgroup presentation, and thereafter actually applied for managerial positions, is simply too speculative and lacks the requisite "tangible adverse effect" on her employment

---

[22]     Hodge does not provide a reasonable basis for her belief that she needed additional training before she could apply for certain positions.  Indeed, Hill provides examples of employees who applied for positions requiring dangerous goods training that they did not have but were later given, such as Marie Shiver and Michael Trujillo.  See Hill Dep. at 16-17; Hill Decl. ¶9.

to constitute an adverse employment action. Id. Hodge has failed to present any facts suggesting that any delay in her completion of the ASPIRE Program resulted in a "serious and material change in the terms, conditions or privileges of [her] employment." See Davis, 245 F.3d at 1239. Thus, she has not established that the failure to train or the delay in providing her training in relation to the ASPIRE Program constituted an adverse employment action.

Similarly, Hodge fails to create a genuine issue of fact as to whether FedEx's failure to allow her to participate in dangerous goods, TORTES, or any other training or experience such as the opportunity to act as sort lead constitutes an adverse employment action. FedEx has presented Hill's deposition testimony as well as her declaration as evidence that such training was not required for Hodge. See Hill Dep. at 16-17, 65; Hill Decl. ¶9. Although Hodge expresses her belief that she could not apply for many open manager positions because they required such training, she does not point to any specific position which actually required completion of that training before applying for the position nor has she attempted to show that she was otherwise qualified for such positions. Likewise, the record does not support Hodge's belief that acting as a sort lead would have afforded her the means to apply for a promotion or was necessary to complete the ASPIRE Program. Notably, Hodge's subjective views as to the need for specific training or the significance of the sort lead are not controlling, and on the record before the Court are inconsistent with the views of a reasonable  person under the circumstances. See Davis, 245 F.3d at 1239. Moreover, Hodge's speculation regarding the lack of such training and its relation to possible promotions is insufficient to create an issue of fact on this point. See Cordoba v. Dillard's

Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact." (internal quotation omitted)).  Absent any evidence relating the lack of training or experience to a failure to promote or other adverse action, Hodge presents at most a delay or denial of training, which, "without more, does not constitute an adverse employment action."  Overs v. Gen. Dynamics Info. Tech., No. 6:11-cv-217-Orl-28DAB, 2012 WL 1854236, at *8 (M.D. Fla. May 21, 2012) (quoting Fitzhugh v. Topetzes, No. 1:04-CV-3258-RWS, 2006 WL 2557921, at *7 (N.D. Ga. Sept. 1, 2006) (citing cases)).

Additionally, even if Hodge could establish that the denial of dangerous goods or TORTES training was an adverse employment action, she has failed to address FedEx's proffered legitimate reasons for denying her that training.  That is, that the training was not required for Hodge's courier position and FedEx declined to expend the resources to provide her with unnecessary training, which would have included not only the training itself, but also pay for the time spent training.  For dangerous goods training, there would have been additional costs associated with sending Hodge to a week-long training in Ft. Lauderdale.  See Hill Decl. ¶7.  To rebut these reasons, Hodge provides an example of a white male employee, Simmons, who received the same training she had requested.  See Hodge Dep. at 69-72.  However, without providing the circumstances of Simmons' employment, Hodge fails to create an issue of fact with regard to FedEx's evidence that such training was operationally necessary for his position.  See Hill Decl. ¶10.  Thus, this evidence does not suggest that FedEx's denial of Hodge's training request was pretextual.

As evidence of pretext, in her Affidavit, Hodge recounts an instance event in which "the management at the NRB facility" hid her from a senior manager and replaced her with

a white female employee who was a handler, not a sort lead, at the time.  <u>See</u> Response at 5; Hodge Aff. ¶11.  She argues that this is evidence that she was "denied the opportunity to meet and make a favorable impression" on the manager, thus creating "a strong circumstantial inference that Defendant's treatment of Plaintiff has been motivated by discriminatory intent based on Plaintiff's race and sex."  Response at 5.  To the extent Hodge argues this incident suggests gender discrimination, because Hodge states she was replaced with another woman, such an argument is unavailing.[23]  As to whether it is circumstantial evidence of race discrimination, even if this account is true, it does not create a question of fact as to whether the stated reasons for FedEx's delay or denial of her training requests were pretextual because Hodge fails to meet those reasons "head on" and rebut them.  <u>See</u> <u>Bojd v. Golder Assocs., Inc.</u>, 212 F. App'x 860, 862 (11th Cir. 2006).  Hodge has neither established that FedEx's stated reasons were unworthy of credence nor has she shown that a discriminatory reason more likely than not motivated FedEx to deny her training.  <u>See</u> <u>Burdine</u>, 450 U.S. at 256.  As such, Hodge has not demonstrated an issue of material fact as to whether FedEx discriminated against her on the basis of either race or gender in failing to provide training or experience.  Thus, to the extent Hodge's Title VII and FCRA discrimination claims are based on the failure to train, FedEx is entitled to summary judgment as to Counts One and Two of the Complaint.

---

[23]     Although, throughout the Complaint and the Response Hodge refers both to gender and race discrimination, she does not explain or cite to any evidence suggesting gender bias on the part of either Hill or Pellegrino, both of whom are women.

2.      **Failure to Promote**[24]

Aside from her contention that a delay in completing the ASPIRE Program impacted her ability to obtain a promotion, Hodges' failure to promote claim is difficult to discern. Indeed, in her Complaint, Hodge does not even allege that she was qualified for a promotion but was denied it as a result of discrimination based on race or sex. See generally Complaint. And, in her Response, Hodge does not address any promotional opportunities for which she applied or which she claims to have been denied due to her race or sex. See Response at 3-5. Nevertheless, in its Motion, FedEx generously construes the following virtually identical allegations in Counts One and Two of the Complaint as asserting a failure to promote claim:

> As a result of Defendant's illegal race [and sex] discrimination against Plaintiff, Plaintiff has suffered damages, and will suffer damages in the future, consisting of loss of back pay, interest on back pay, loss of front pay, loss of anticipated salary due to salary increases, loss of opportunity, emotional pain, suffering, inconvenience, and mental anguish.

---

[24]      In her Response, Hodge cites her Warning Letter and the suspension she received as precluding her from being considered for promotions for one year. See Response at 4. She cites to evidence of this discipline to support her allegations that FedEx obstructed her promotional opportunities based on her race and gender. See id. at 3-4. While FedEx disputes the effect of the Warning Letter, as discussed above, FedEx policies do suggest that it might affect a decision to promote her. However, in the Complaint, Hodge specifically alleges that this conduct was taken in retaliation against her for complaining about discrimination, rather than discrimination itself. Because Hodge did not allege that the Warning Letter was a discriminatory act, she cannot raise this claim now. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). Regardless, the Court will consider whether summary judgment is appropriate as to her retaliation claim based on the Warning Letter and attendant suspension below.

Complaint ¶¶24, 32; Motion at 19.[25]  FedEx further points to Hodge's deposition testimony that she applied for promotions in Orlando and Atlanta in March of 2014 as forming the basis of her failure to promote claims.  The Court is skeptical whether such a claim was plead, whether it is properly before the Court,[26] and even if plead why it should not be deemed to be abandoned given the absence of any response to Defendant's Motion on this issue from Hodge.  Nevertheless, as FedEx addressed the merits of the claim, in an abundance of caution, the Court considers whether the record could support a failure to promote claim with regard to either the Orlando or Atlanta positions, and finds that it cannot.

_____

[25]    Notably, Hodge cannot assert a failure to promote claim based on positions for which she did not apply.  Generally, if an employer has a formal system for posting vacancies and allowing employees to apply for such vacancies, "an employee who fails to apply for a particular position cannot establish a prima facie case of discriminatory failure to promote."  Giles v. Bellsouth Telecommunications, Inc., 542 F. App'x 756 (11th Cir. 2013) (quoting Williams v. Giant Food Inc., 370 F.3d 423, 430 (4th Cir. 2004)).  However, an employee may establish a prima facie case of discrimination without having applied for a position if she "can show that [she] had a 'justifiable belief' that the employer's discriminatory hiring practices made application a futile gesture."  Williams v. Waste Mgmt., Inc., 411 F. App'x 226, 228 (11th Cir. 2011) (quoting EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1274 (11th Cir. 2002)).  To show a justifiable belief, an employee must show both that she "had a real and present interest in the job for which the employer was seeking applications" and that she "would have applied for the job but effectively was deterred from doing so by the employer's discriminatory practices."  Id. (quoting Joe's Stone Crabs, Inc., 296 F.3d at 1274).  Here, FedEx utilizes a system called Career Opportunity Postings to post open management positions every week that its AIM and ASPIRE candidates may access through the company intranet website.  See Declaration of Michael M. Harper, Exhibit J to Motion (Doc. Nos. 25-6–25-7; Harper Decl.) ¶2; Declaration of Kenneth J. Hauser, Exhibit K to Motion (Doc. No. 25-8; Hauser Decl.) ¶2; Declaration of Matthew T. Molander, Exhibit N to Motion (Doc. No. 25-10; Molander Decl.) ¶2.  Thus, to establish a prima facie case of discrimination without having applied for certain promotions, Hodge must demonstrate that she had a justifiable belief that any application would have been futile.  She has made no attempt to do so.  Neither in her deposition nor her affidavit does Hodge claim she had a justifiable belief that application for promotions would have been a futile gesture based on any discriminatory hiring practice on the part of FedEx.  Accordingly, the Court does not consider any failure to promote claims based on positions for which Hodge did not apply.

[26]    Because Hodge did not apply for any promotions until 2014, after she filed her EEOC charge and the instant action, she cannot raise a failure to promote claim based on either the Orlando or Atlanta positions in this action.  Instead, Hodge is limited to the claims she raised in her EEOC Charge.  See Gregory v. Ga. Dep't of Human Resources, 355 F.3d 1277, 1279-80 (11th Cir. 2004); see also Holmes v. Ala. Bd. of Pardons & Paroles, 591 F. App'x 737, 745 (11th Cir. 2014) ("[A] plaintiff's complaint remains 'limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'  We have cautioned 'that allegations of new acts of discrimination are inappropriate' for a post-charge judicial complaint.") (internal citations omitted).

In order to establish a <u>prima facie</u> case of discrimination on the basis of a failure to promote, a plaintiff must demonstrate only that: (1) she belonged to a protected class; (2) she was qualified for and applied for a position that the employer was seeking to fill; (3) despite qualifications, she was rejected; and (4) the position was filled with an individual outside the protected class. <u>Springer v. Convergys Customer Mgmt. Grp. Inc.</u>, 509 F.3d 1344, 1347 n.2 (11th Cir. 2007); <u>Vessels v. Atlanta Indep. Sch. Sys.</u>, 408 F.3d 763, 768 (11th Cir. 2005). "In the context of a promotion, a plaintiff cannot prove pretext by simply arguing or even by showing that [s]he was better qualified than the [person] who received the position [s]he coveted." <u>See</u> <u>Bennett v. Chatham Cnty. Sheriff Dep't</u>, 315 F. App'x 152, 162 (11th Cir. 2008) (quoting <u>Springer</u>, 509 F.3d at 1349). Rather, to demonstrate pretext "[a] plaintiff must show that the disparities between the successful applicant's and her own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" <u>See</u> <u>Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.</u>, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal citation omitted).

FedEx does not dispute that Hodge can state a <u>prima facie</u> case of discrimination with regard to FedEx's failure to promote her to either the Atlanta or Orlando managerial positions. <u>See</u> Motion at 19-21. Nevertheless, FedEx argues that Hodge cannot rebut FedEx's proffered legitimate business reasons for not promoting her. FedEx has come forward with evidence that FedEx selected Matthew Futral (Caucasian male) for the Atlanta position and Shawn McGrath (Caucasian male) for the Orlando position because these two applicants were the most qualified of those who applied for the positions. <u>See</u> Motion at 7,

19-21; Declaration of Michael M. Harper, Exhibit J to Motion (Doc. Nos. 25-6–25-7; Harper Decl.) ¶¶3-10; Declaration of Kenneth J. Hauser, Exhibit K to Motion (Doc. No. 25-8; Hauser Decl.) ¶¶3-7.  Further, Senior Managers Michael Harper and Kenneth Hauser who selected the applicants for interviews explain that they did so based on an evaluation of the candidates using a structured point system and Hodge did not receive enough points to merit an interview for either position.  <u>See</u> Harper Decl. ¶¶3-10; Hauser Decl. ¶¶3-7.  FedEx has produced the scoring sheets which reflect the evaluation of the candidates and confirm this testimony.  Accordingly, FedEx has met its burden to produce legitimate non-discriminatory reasons for not promoting Hodge[27] and Hodge has not pointed to any evidence to raise any genuine dispute of fact as to pretext with regard to either position. Indeed, Hodge may even concede the lack of such evidence as she does not mention these promotions in her Response.  Thus, FedEx is entitled to summary judgment as to any Title VII and FCRA discrimination claims based on any failure to promote claims raised in Counts One and Two of the Complaint.

### C.    Retaliation

In Count Three of the Complaint, Hodge alleges Title VII and FCRA claims of retaliation based on two separate acts of alleged retaliation: the Warning Letter and accompanying suspension arising from the auto accident along her route and the denial of her medical clearance resulting in her removal from her courier route.  <u>See</u> Complaint ¶¶18-

---

[27]    FedEx also argues that Hodge cannot establish a failure to promote claim for the sort lead position because the sort lead is only an informal position.  <u>See</u> Motion at 22.  Because FedEx is correct that the record does not support a finding that sort lead is a specific position to which FedEx could have failed to promote Hodge, the Court has considered Hodge's allegations related to the sort lead role only as an allegation of the failure to train.

19, 39.[28] Under Title VII an employer is also prohibited from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice . . . or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  "A prima facie case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action."  See Crawford, 529 F.3d at 970.   As with a substantive race discrimination claim, if an employer articulates legitimate reasons for its actions, a plaintiff must then "'show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct.'"  See McCann, 526 F.3d at 1375 (quoting Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999)).  To establish pretext, a plaintiff must demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  Id. (internal citation omitted).

Significantly, in 2013, the Supreme Court clarified that a Title VII plaintiff must demonstrate "but-for" causation to sustain a retaliation claim.  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533 (2013); see also Booth v. Pasco Cnty., Fla., 757 F.3d 1198,

---

[28]     As with her discrimination claims, Hodge asserts parallel retaliation claims under Title VII and the FCRA.  See Complaint, Count Three.  Because the FCRA is modeled after Title VII, and claims brought under it are analyzed under the same framework, the state-law retaliation claims do not need separate discussion and their outcome is the same as the federal retaliation claims.  See Holland, 677 F.3d at 1054 n.1; Alvarez, 610 F.3d at 1271; Gray v. City of Jacksonville, Fla., 492 F. App'x 1, 3 (11th Cir. 2012).

1207 (11th Cir. 2014) (applying the <u>Nassar</u> 'but-for' causation standard to claims of retaliation under Title VII and the FCRA). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." <u>Nassar</u>, 133 S.Ct. at 2533. Thus, to prevail, on a retaliation claim the employee must ultimately prove that the employer's proffered reason was pretextual and that unlawful retaliation was the "but for" cause for the adverse employment action. <u>See</u> <u>Mealing v. Georgia Dep't. of Juvenile Justice</u>, 564 F. App'x 421, 427 (11th Cir. 2014).

In this case, FedEx does not dispute that Hodge engaged in protected activity by complaining about what she believed was discriminatory treatment, and that her suspensions constitute adverse employment action. Rather, FedEx argues that Hodge cannot establish a causal link between the protected activity and either adverse action. <u>See</u> Motion at 23-24. Hodge met with Briscoe and Hill in February of 2011. The first alleged act of retaliation occurred in December of 2011, when Hill issued Hodge the Warning Letter and suspended Hodge for five days, and the second occurred in March of 2012, when Hodge's medical certification lapsed. Thus, the shortest time period between the complaint of discrimination and the alleged retaliation is roughly nine months. Generally, in the absence of any other evidence of causation, a nine-month period between the protected conduct and the alleged adverse action is too protracted to infer a causal relation. <u>See</u> <u>Drago v. Jenne</u>, 453 F.3d 1301, 1308 (11th Cir. 2006). Indeed, "mere temporal proximity, without more, must be 'very close.'" <u>Thomas v. Cooper Lighting, Inc.</u>, 506 F.3d 1361, 1364 (11th Cir. 2007). Although Hodge appears to recognize that she cannot rely on temporal proximity to establish the causal connection for her <u>prima facie</u> case, in her Response, she states she "believes she

has produced enough 'other evidence' to show a causal connection between her protected expression and her allegation of retaliation when she was harshly disciplined by management in December 2011." Response at 6. Hodge does not identify this evidence, however, in her affidavit, she discusses an example of another female employee who did not receive a Warning Letter and five-day suspension as she did. Hodge Aff. ¶7.

Preliminarily, the Court notes that in responding to the Motion for Summary Judgment Hodge makes no mention of her claim of retaliation stemming from the denial of her medical clearance. As such, it appears Hodge is abandoning her allegation that her removal from her courier route following Dr. Agatep's sleep apnea diagnosis was retaliatory. However, even if Hodge were not abandoning this argument, this retaliation claim would fail. It is undisputed that Dr. Agatep independently determined, based on her own assessment that Hodge likely suffered from sleep apnea and further testing was warranted. See Hill Decl. ¶18; Hill Dep. at 38-39; Hodge Dep. at 134-35. Dr. Agatep did not deny Hodge medical clearance but instead gave her three months to complete such testing. See December 16th Medical Report. Hodge failed to do so, and her medical certification lapsed resulting in her inability to operate her courier route. It is further undisputed that when Hodge provided FedEx with documentation from her own physician indicating that she did not suffer from sleep apnea, FedEx promptly forwarded the information to Dr. Agatep who gave Hodge the necessary medical clearance. FedEx then returned Hodge to her regular duties. More importantly, nothing in the record suggests that anyone at FedEx had any influence on Dr. Agatep's medical opinion. Consequently, there is no genuine dispute of material fact as to

whether the brief denial of Hodge's medical clearance was related in any way to her February 11 complaints to Briscoe and Hill regarding alleged discrimination.

As to the Warning Letter and accompanying suspension, it is unclear what "other evidence" Hodge contends demonstrates a causal connection between this discipline and her protected activity.  In her deposition, Hodge testified that she had some difficulty with Hill[29] and that, during the February meeting and afterwards, Hill attempted to intimidate her by pointing her finger in her face.  See Hodge Dep. at 79 ("Whenever she - - she would talk to anyone normal, but then when it came to me, she started pointing her finger like this in my face.").  However, Hodge points to no evidence suggesting that whatever animus Hill may have harbored towards Hodge was born out of Hodge's February 2011 complaint.  Additionally, Hodge's Affidavit contains only conclusory allegations that she received the Warning Letter because of her race or gender (or because of her complaints about discriminatory treatment).  Hodge Aff. ¶7.  Nonetheless, even if Hodge could point to evidence to satisfy the requisite causal connection, the burden then shifts to FedEx to offer a legitimate reason for its actions and it has done so.  It is undisputed that Hodge left the scene of the accident without reporting it and that she was suspended for that conduct, not the accident itself.  See Hill Dep. at 43-44.  FedEx maintained a clear policy obligating Hodge to report any incident, even one as seemingly minor as running into a tree branch, from the

---

[29]    The Court notes that Hodge appears to hold Briscoe solely responsible for the issuance of the Warning Letter.  Response at 4 ("The person who handed out the discipline to Plaintiff was Sr. Manager John Briscoe.").  While there is no dispute that Briscoe was aware of her discrimination complaints as he was the person to whom she was complaining, and Briscoe conferred with Hill regarding whether to issue the Warning Letter, given the nine-month lapse in time, there is no evidence in the record whatsoever to suggest a causal connection between her complaints and the Warning Letter as far as Briscoe is concerned.  The only evidence in the record regarding Briscoe at all is that he attended the meeting with Hill and Hodge, he conferred with Hill regarding Hodge's failure to report and the Warning Letter, he processed her DOT certification paperwork, and he found her other work at the FedEx warehouse while Hodge's recertification was pending.

location of the incident immediately.   Indeed, FedEx policy guidelines dictate that the <u>minimum</u> punishment for failing to report an accident is a five-day suspension.  See Accident Policy at 6.   Further, FedEx submits three other Warning Letters for multiple-day suspensions for the same conduct involving failing to report tree-branch incidents.  See Pellegrino Decl. ¶7, Exhibits 1-3 to Pellegrino Decl.[30]

Because FedEx has offered a legitimate, non-discriminatory reason for Hodge's suspension, "to avoid summary judgment [Hodge] must introduce significantly probative evidence showing that the asserted reason is merely pretext for discrimination.'" Bojd, 212 F. App'x at 862 (quoting Brooks, 446 F.3d at 1163).  "'If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.'" Id. (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079,1088 (11th Cir. 2004)).  "[T]he inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason is really a pretext for unlawful discrimination." E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272-73 (11th Cir. 2002) (quoting Burdine, 450 U.S. at 255-56).  Moreover, the Court does not sit "as a 'super-personnel department,' and it is not [the Court's] role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." Alvarez, 610 F.3d at 1266 (quoting Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000)).

---

[30]     The Court recognizes that Pellegrino, not Hill, was the supervisor who disciplined two white male and one African-American female employees for failing to report the tree-limb incidents.  Thus, the examples are of little, if any relevance in determining Hill's retaliatory bias.  Nonetheless, these instances demonstrate that FedEx's Accident Policy is consistently applied and rebuts Hodge's unsubstantiated allegations that the Warning Letter was retaliatory.

In an effort to show pretext, Hodge states in her affidavit that a white female courier, April Shanley, failed to report an accident in 2013, but did not receive a discipline or suspension as Hodge did.   Hodge Aff. ¶7.   Hodge does not include any additional information as to who made the determination to discipline Shanley or how she knew that Shanley had not been disciplined.  In contrast, FedEx submits a performance reminder letter Hill issued to Shanley for a preventable accident on September 10, 2013, which was to remain active for six months.  See Inter-Office Memorandum RE: Performance Reminder/02-1-A11 Other Prev Veh Acc/Occ, Exhibit B to Supplemental Ressler Decl. (Doc. No. 36-1 at 17-18; Performance Reminder).[31]  Shanley's Performance Reminder does not reference any failure to report an accident.  Rather Shanley was disciplined for striking a fixed object in a parking lot and causing over $1,000 in damage.  See Performance Reminder at 1.  Like Shanley, Hodge herself received only a counseling statement for the accident itself.  While Hodge disagrees with the determination that she could have prevented the accident, the discipline which Hodge contends was retaliatory is not the counseling statement prompted by the accident itself but rather the Warning Letter issued for leaving the scene without reporting the accident.  Because Hodge was disciplined in the Warning Letter for failing to report an accident, she and Shanley were not similarly situated and the differences in their punishments is not evidence of pretext.  Moreover, Hodge has failed to point to even a scintilla of evidence suggesting that her complaint of discrimination was the "but for" cause of FedEx's issuance of the Warning Letter and suspension.  On review of the record, Hodge

---

[31]      It appears from a review of the Acceptable Conduct policy that there is a difference between warning letters and performance reminders, but the relative severity between the two forms of discipline is unclear.

has failed to present any evidence upon which a reasonable jury could find that Hill did not discipline her for failing to report an accident but instead disciplined her in retaliation for her complaints of discrimination made nine months earlier. Accordingly, FedEx is entitled to the entry of summary judgment in its favor as to the claims raised in Count Three of the Complaint.

## IV.    Conclusion

In light of the foregoing, FedEx's Motion for Summary Judgment is due to be granted in its entirety. Accordingly, it is

**ORDERED**:

1.     Defendant's Amended Motion for Summary Judgment and Incorporated Statement of Undisputed Material Facts (Doc. No. 23) is **GRANTED.**

2.     The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant Federal Express Corporation and against Plaintiff Carmen Hodge.

3.     The Clerk of the Court is further directed to terminate any remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** at Jacksonville, Florida on September 15, 2015.

**MARCIA MORALES HOWARD**
United States District Judge

lc16
Copies to:
Counsel of Record